IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON

IN RE:

HUNTINGTON SPINE REHAB
AND PAIN CENTER
LOCATED AT 3554 US ROUTE 60 EAST,
BARBOURSVILLE, WV 25504          MAGISTRATE NO. 3:10-mj-00045

R.E.S.T./REST ENSURED SLEEP TECHNOLOGIES
LOCATED AT 3554/3458 US ROUTE 60 EAST,
BARBOURSVILLE, WV 25504          MAGISTRATE NO. 3:10-mj-00046

RESIDENCE OF DR. PHILIP F. FISHER D.O.
LOCATED AT 1976 HASH RIDGE ROAD,
BARBOURSVILLE, WV 25504          MAGISTRATE NO. 3:10-mj-00047

## A F F I D A V I T

STATE OF WEST VIRGINIA

COUNTY OF CABELL, to-wit:

I, Mark A. Armstrong, II, being duly sworn, do hereby depose and state as follows:

## A. Introduction

I am a Diversion Investigator for the United States Department of Justice, Drug Enforcement Administration (DEA), Charleston, WV Resident Office. I have been employed as an investigator with the DEA for over five years. My responsibilities include the investigation of violations of the Controlled Substances Act under Title 21 of the United States Code. In conjunction with my employment, I completed approximately 13 weeks of training at the Drug Enforcement

1

Administration's Training Academy in Quantico, Virginia, regarding the diversion of controlled pharmaceuticals. Since completing the training in 2005, I have participated in dozens of investigations involving schemes to divert controlled substances in the Western District of Pennsylvania, the Southern District of West Virginia, and the Northern District of West Virginia. Based on my experience and training, I know that the diversion of controlled pharmaceuticals often involves a licensed physician who, for no legitimate medical purpose, prescribes and/or dispenses controlled substances to individuals, often without providing legitimate medical examinations. The physician then engages in the manipulation of records, invoices, and prescriptions to conceal the illegal diversion of controlled substances.

The information contained in this affidavit has been obtained by, or provided to me by, individuals knowledgeable of the subject matter, including others in law enforcement that provided me with information obtained during the ongoing investigation. This affidavit does not include every fact gathered during the course of this investigation, but simply includes selected facts needed to establish probable cause to obtain a search warrant for the following locations: (1) Huntington Spine Rehab and Pain Center, (Huntington Spine), (2) R.E.S.T./Rest Ensured Sleep Technologies (Rest Ensured) located at 3554/3458 US Route 60 East, Barboursville,

2

WV 25504,[1] and (3) the residence of Dr. Philip F. Fisher, (D.O.), 1976 Hash Ridge Road, Barboursville, WV 25504.

This affidavit is made in support of an application for search warrant(s) to search and seize fruits and evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, 843(a)(2), 843(a)(3). The locations to be searched are the medical offices/business premises of Dr. Philip F. Fisher (D.O.) (Dr. Fisher), i.e.- Huntington Spine and Rest Ensured, located at 3554/3458 US Route 60 East, Barboursville, WV 25504, and Dr. Fisher's residence at 1976 Hash Ridge Road, Barboursville, WV 25504. The subject premises are further described in Attachments A, which are appended to this Affidavit and incorporated herein by reference. The items that are the subject of the search and seizure applied for in this application and affidavit are described in AttachmentB hereto, which is appended to my Affidavit and incorporated herein by reference.

B. **Investigation**

**CASE BACKGROUND**

The Drug Enforcement Administration (DEA) and the West Virginia

---

[1] Surveillance on Huntington Spine and Rest Ensured indicated no identifiable address/street numbers on the buildings. Records of the West Virginia Secretary of State indicate that both businesses are located at 3554 US Route 60, East, Barboursville, West Virginia, 25504. The DEA registration records of Dr. Debra Stultz (M.D.) (Dr. Stultz), who works at Rest Ensured on Wednesdays, indicate that the street number of Rest Ensured is 3458. An online search of records from the Cabell County Assessor's Office is negative for the address 3458 US Route 60, East, Barboursville, West Virginia. Regardless of the actual street numbers, the property that the United States seeks to search is that identified by photos in attachment A hereto, depicting Huntington Spine and Rest Ensured.

State Police (WVSP) are conducting an ongoing criminal investigation of Dr. Fisher, who is doing business/practicing medicine in two separate businesses—Huntington Spine and Rest Ensured located at 3554/3458 US Route 60 East, Barboursville, WV 25504.  The buildings which house Huntington Spine and Rest Ensured are owned by Dr. Fisher.

I know from my own experience, and from my review of documents and statements of others, that Philip Fisher is a doctor of osteopathic medicine practicing in Barboursville, West Virginia. Moreover, based on my own experience and review of documents and statements of others, Dr. Fisher resides at 1976 Hash Ridge Road, Barboursville, WV 25504. Records maintained by the West Virginia Department of Motor Vehicles show Dr. Fisher as residing at 1976 Hash Ridge Road, Barboursville, WV 25504, and the official website of the Cabell County, WV Assessor's Office lists Dr. Fisher as owning 1976 Hash Ridge Road, Barboursville, WV 25504.

This investigation indicates that Dr. Fisher has unlawfully obtained controlled substances from patients and re-distributed them to girlfriends and others. Dr. Fisher indicated that he also possessed with intent to unlawfully utilize some of these controlled substances for his own personal consumption. Moreover, evidence indicates that Dr. Fisher conspired to misuse his DEA registration by permitting office staff to utilize his DEA registration number to distribute controlled substances to patients. This investigation also shows Dr. Fisher as being potentially complicit in the overdose deaths

4

of at least fourteen (14) individuals, including the death of a former girlfriend.

Dr. Fisher is licensed as an Osteopathic Physician (D.O.) with the West Virginia Board of Osteopathy, and holds a permit through the West Virginia Board of Pharmacy to handle controlled substances. Dr. Fisher is also registered with the DEA as a practitioner under the provisions of Title 21, United States Code, Sections 822 and 823. Pursuant to Title 21, United States Code Section 823, Dr. Fisher is specifically authorized to dispense and prescribe narcotic drugs to individuals for maintenance treatment or detoxification (drug addiction treatment).

The activity indicated in this investigation may constitute the following and other criminal violations:

(a) 21 U.S.C. § 846(a)(1), conspiracy to distribute controlled substances;

(b) 21 U.S.C. § 841(a)(1), distribution of controlled substances;

(c) 21 USC § 843(a)(2), miuse of a registration number issued to another person to distribute controlled substances; and

(d) 21 U.S.C. § 843(a)(3), obtaining controlled substance by fraud

In July 2010, the Tri-State Airport Police Department in Huntington, WV provided the Charleston, WV Resident Office of the Drug Enforcement Administration (DEA) an investigative report detailing an interview of Dr. Fisher, by Police Chief Kenneth Adams.

5

According to that report, on April 15, 2010, airport security discovered two prescription vials inside an article of luggage belonging to Dr. Fisher. The prescription vials listed the names ███████████ and ██████████ and contained three (3) oxycodone 30mg tablets and 78 ½ hydrocodone 10mg tablets, respectively. Moreover, inside Dr. Fisher's luggage was a container "marked with a prescription for Philip Fisher" and a bottle of injectable medication marked "Bupivacaine," a non-controlled substance.

When Chief Adams inquired about the oxycodone and hydrocodone prescribed in the names of other individuals, Dr. Fisher initially provided conflicting explanations, saying he intended to destroy the medication and then disclosing that he planned to deliver them. Eventually, Dr. Fisher stated the controlled substances were "turned into him." Dr. Fisher informed Chief Adams that he suffered from injuries sustained during a plane crash, and that the medication prescribed in his name is for those injuries.[2] Dr. Fisher continued to say that the oxycodone and hydrocodone in the names of his two patients "were in his office and that he was taking them with him to Disneyland in the event his pain was so bad, he would have those medications to take himself."

Also in July 2010, the Charleston, WV Resident Office of the DEA received a package of documents with an anonymous letter, stating:

---

2 A review of several online news articles confirmed that Dr. Fisher sustained injuries during a single-engine plane crash in Iowa in January 2010.

*Please find information confirming that Philip Fisher, DO, DEA #█████████ was out of state on many dates when there are clearly prescriptions signed by him. He leaves stacks of blank, signed Rx pads for his staff to fill out so that he can avoid the expense and hassle of hiring a doctor to fill in during his absences. . . The staff is now in the difficult position of choosing between their livelihood, and doing what is right according to law. He will be going out of town again from July 26-30, 2010.*

The package contained office schedules, which indicated Dr. Fisher as being "out of the office" during the following time frames:

| DATES | REASON FOR ABSENCE |
|---|---|
| November 2 through November 6, 2009 | "New Orleans for AOA" |
| December 22 through December 28, 2009 | None provided |
| April 19 through April 23, 2010 | "Medtronic Course in Minneapolis" |

The package also included corresponding photocopies of Schedule II controlled substance prescriptions, issued during Dr. Fisher's alleged absences.

In August 2010, your affiant received a report from an anonymous caller claiming to be a former employee of Dr. Fisher. The caller stated that, for approximately a year, Dr. Fisher pre-signed 60-160 blank prescriptions per day and assigned employees to fill-out the blank prescriptions. According to the caller, most of these prescriptions were for Schedule II controlled substances, which had been requested by established patients of the clinic. According to

7

the caller, Dr. Fisher assigned a specific night of the week to almost each employee, including the office receptionist, medical assistant, accounts payable clerk, and billing clerk.

The caller further described Dr. Fisher as leaving a "whole box of blank pads" during his vacation around Christmas 2009. According to the caller, Dr. Fisher did not review his patients' requests for controlled substance prescriptions prior to allowing staff to fill-out the prescriptions. If patients requested new prescriptions earlier than medically indicated, the caller described Dr. Fisher as instructing staff members to write-out the prescriptions, citing potential malpractice claims if the patients did not get what they wanted.

Per the caller, the daily practice of signing blank prescriptions ended in spring 2010 when Huntington Spine switched to a computer system that prints prescriptions, which Dr. Fisher signed. However, Dr. Fisher reverted to the old system when he travelled to Minneapolis, MN on August 6, 2010. According to the caller, a medical staff member videotaped the filling-out of blank prescriptions on this date.

The anonymous caller also reported Dr. Fisher as taking back controlled substances from patients and storing them in his office safe. The caller indicated that Dr. Fisher then dispensed these controlled substances to patients and girlfriends. The caller identified one girlfriend, ███████, as dying in █████████

8

due to an overdose of Duragesic, Xanax, and over-the-counter sleeping pills.[3] Moreover, the caller "overheard" Dr. Fisher providing his current girlfriend, ███████████, with "glorified aspirin," a term previously used by Dr. Fisher to refer to morphine. Per the caller, ████████ once informed office staff that Dr. Fisher injected her with an unknown substance while asleep. Lastly, the caller stated that Dr. Fisher allegedly transports pills back to his house and keeps oxycodone in an unlocked office desk.

In response to the aforementioned, your affiant and Trooper Michael Lafauci, West Virginia State Police (WVSP), Bureau of Criminal Investigations, obtained profiles of controlled substance prescriptions filled at pharmacies in West Virginia which are attributed to Dr. Fisher's DEA registrations. We also queried the Kentucky prescription monitoring data base by patient name. These reports were obtained from online databases maintained by the West Virginia Board of Pharmacy and Kentucky Board of Pharmacy. Your affiant and Trooper Lafauci also acquired the police and medical examiner reports pertaining to the overdose death of Dr. Fisher's girlfriend, ███████████. It should be noted that, based on a review of these reports, ████████████ real name is ████████████.

---

3 Duragesic is a brand name for Fentanyl, a Schedule II pain killer which is highly addictive and prone to abuse.

According to the West Virginia Office of the Chief Medical Examiner, ▮▮▮ died on ▮▮▮▮▮▮▮▮▮ as the result of combined fentanyl, alprazolam, and doxylamine intoxication, due to an application of "non-prescribed" transdermal fentanyl patch (75ug/hour release). The report stated that there was no evidence of "prescription access" to fentanyl by ▮▮▮▮, meaning that ▮▮▮▮ seemingly was not prescribed fentanyl.

On ▮▮▮▮▮▮▮▮ the Cabell County Sheriff's Office responded to ▮▮▮▮ residence, located at ▮▮▮▮▮▮▮▮▮▮ WV, in reference to ▮▮▮ being found unresponsive in her bed. The responding deputy discovered an open fentanyl transdermal patch package in the bathroom with an expiration date of March 2008. The sheriff's deputy also spoke with Dr. Fisher, who stated he prescribed fentanyl to ▮▮▮ "a long time ago for an injury she received falling off a horse." The sheriff's deputy listed the following medications as being collected and sent to the medical examiner's office:

- 82 pills of propranolol 10mg
- 69 pills of Xanax 2mg
- 30 pills of skelaxin 800mg
- 19 capsules of visteril 25mg
- 24 pills of propoxy-n 100-650
- 139 pills of Xanax 2mg (prescribed in 2008)
- 9 small blue pills 5mg, unknown medicine
- 1 medium white pill unknown medicine

Your affiant notes that prescription profiles obtained in the course of this investigation fail to show fentanyl prescriptions in ▮▮▮▮ name, which contradicts Dr. Fisher's statement to the sheriff's deputy. Moreover, these same profiles show ▮▮▮ as

10

receiving only 90 tablets of Xanax 2mg in 2008, significantly less than the 139 tablets recovered by the responding sheriff's deputy.

**INTERVIEWS**

In September 2010, your affiant and WVSP Troopers Mike Lafauci and Mike Smith interviewed ██████████, the sister of ██████████ ██████ informed investigators that █████, a nurse anesthetist, began seeing Dr. Fisher as a patient in 2008 due to back pain. ██████ indicated that █████ and Dr. Fisher began dating after Dr. Fisher asked █████ out in the course of a doctor-patient visit. According to ██████, shortly after █████ met Dr. Fisher, ██████ became ill and informed family that she had "mono," which Dr. Fisher referred to as Epstein-Barr Syndrome.

Per ███████, ██████ moved into Dr. Fisher's residence, which is a double wide trailer on Hash Ridge Road in Cabell County, WV. ██████ advised investigators that █████ moved in with Dr. Fisher so he could care for ██████ illness. ████████ stated that Dr. Fisher agreed to pay for ██████ bills as long as they cohabitated. ██████ said that, in May 2009, █████ moved out of Dr. Fisher's home due to a strained relationship with Dr. Fisher's daughter. ██████ informed investigators that █████ also worked for Dr. Fisher as a nurse anesthetist, even though █████ often was too sick to actually perform her duties.

██████ stated that, according to her father, █████████████, Dr. Fisher administered IV treatments to ███████████ at his office.

11

Per █████, ████████ often drove ████████████ to Dr. Fisher's office in response to ████████ being very sick and dehydrated, and after approximately one hour at Dr. Fisher's office, ████████would be "good as new."

On ████████████████, ████████ arrived at ████████ residence and stated he found ████████████ deceased at her home. ████████ and her father traveled back to ████████ residence and called the authorities. While waiting for the authorities to arrive, ████████ stated that Dr. Fisher arrived and acted nervous. Per ████████, without being accused of doing so, Dr. Fisher began telling ████████████ that he did not cause ████████ death. Moreover, ████████ said, Dr. Fisher seemed more intent on retrieving a laptop computer from the home than the fact that ████████ died.

████████ stated it was determined that ████████ died with a fetanyl patch affixed to her neck. Per ████████, Dr. Fisher told the Cabell County Sheriff's Department that he prescribed the patches to ████████ for an injury incurred during a horseback riding accident. ████████ advised that, on a subsequent date, she went through ████████ home and located a box of fetanyl patches, prescribed by Dr. Fisher to ████████████████ of ████████. Moreover, ████████ discovered a large duffel bag in a bedroom closet, which contained various medications prescribed to others. ████████ stated she photographed these medications and turned them over to the sheriff's department. Per ████████, the photographs depict Dr. Fisher as the prescriber. One

12

such prescription, per ▮▮▮▮, actually had been prescribed to an area chiropractor named ▮▮▮▮▮▮▮▮▮▮, alternate last name ▮▮▮▮.

▮▮▮▮ continued to inform your affiant and troopers that, at some point, she noticed her father, ▮▮▮▮▮▮▮, as showing signs of an illness, and learned that Dr. Fisher was prescribing him medications, including Lunesta, hydrocodone, Paxil, and spinal injections. Per ▮▮▮▮, ▮▮▮▮▮ was not Dr. Fisher's patient, and was already receiving medications from his primary doctor. ▮▮▮▮ said that she forbade her father from taking more medication from Dr. Fisher, which resulted in ▮▮▮▮▮▮ health "getting back to normal." ▮▮▮▮ disclosed that Dr. Fisher also prescribed medication, including hydrocodone, to ▮▮▮▮▮ paramour, ▮▮▮▮▮▮▮, who was never a patient of Dr. Fisher.

▮▮▮▮ provided your affiant and troopers with a packet of information pertaining to Dr. Fisher. The packet included photographs of the medication discovered by ▮▮▮▮ in ▮▮▮▮ residence, which depict a box of fentanyl patches prescribed by Dr. Fisher to ▮▮▮▮ ▮▮▮ on May 23, 2006. The photographs also show a container of morphine sulfate prescribed by Dr. Fisher to ▮▮▮▮▮ at an unknown date. Moreover, the photographs depict two bottles of Ketoprofen, a non-controlled substance, which was prescribed to Dr. Fisher on May 6, 2008. They also portray several bottles of propofol and

oxytocin, which are non-controlled substances.[4]

In October 2010, your affiant and WVSP Trooper Michael LaFauci conducted a joint interview of ███████ and ███████████, two former employees of Dr. Fisher at Huntington Spine. ██████ described her responsibilities as including accounts payable and insurance pre-certification, and stated she worked for Dr. Fisher from November 2008 to August 2010. ███████ stated she worked as the billing manager from summer 2004 to July 2010.

██████ identified herself as the anonymous caller in July 2010. Moreover, ██████ informed investigators that she mailed the anonymous package received by the DEA in July 2010, referenced previously herein. Your affiant and trooper reviewed the information anonymously provided by ██████ in July 2010. ██████ verified the information as being accurate, except for the allegation that Dr. Fisher left his medical staff with a "whole box" of pre-signed blank prescriptions during his vacation around Christmas 2009. ██████ stated it most likely was "half of a box," containing approximately 500 pre-signed blank prescriptions.

According to ██████ and ██████ Dr. Fisher started heavily relying on office staff to fill-out pre-signed blank prescriptions, on a daily basis, around August 2009. As a "rule of thumb," Dr. Fisher

---

4 Propofol is, according to news reports, the drug that entertainer Michael Jackson used for sleep problems and which caused his death. Currently Propofol is not classified as a controlled substance. However, the DEA is currently advocating that it be reclassified as a controlled substance.

14

authorized staff to automatically issue Schedule II controlled
substance prescriptions to patients seen by the office within the
last six months. These patients were not required to been seen by
the medical office for these "refills."[5] Per ▮▮▮▮▮, Dr. Fisher hired
substitute physicians only when recovering from his plane crash in
January 2010 and during the week of July 26, 2010. ▮▮▮▮▮ in a
later phone call with your affiant stated that, there were other
times that Dr. Fisher hired a physician to cover the practice, but
only with regard to selected patients.

In the course of the interview, ▮▮▮▮▮ and ▮▮▮▮▮ informed
investigators it was "known" that ▮▮▮▮▮ took medication from Dr.
Fisher's office. Per ▮▮▮▮▮ and ▮▮▮▮▮, ▮▮▮▮▮ possessed key and access
codes to the office, and was believed to have access to the controlled
substances storage safe. ▮▮▮▮▮ and ▮▮▮▮▮ described ▮▮▮ as having
a "mystery illness," often arriving at the medical office dehydrated
and requiring an IV injection.[6] On at least one occasion, they said,
▮▮▮▮▮ accompanied Dr. Fisher into his personal office, where Dr.

_____

[5] According to ▮▮▮▮▮ and ▮▮▮▮, the cost to the patient for a Schedule
II "refill" without any corresponding office visit/procedure/test was
$3.00 per refill request.  Title 21 U.S.C § 829(a) provides that – ".
. . No prescription for a controlled substance in schedule II may be
refilled." New prescriptions must be written by the practitioner.

[6] According to ▮▮▮▮▮ and ▮▮▮▮▮, Dr. Fisher sometimes performed procedures
on his patients/administered drugs at Rest Ensured which is located directly
across the parking lot from Huntington Spine.  Information obtained from
the West Virginia Board of Osteopathy corroborates the assertion that Dr.
Fisher performed procedures/administered medicine to certain patients.
Further investigation indicates that Dr. Fisher owns the buildings where
Huntington Spine and Rest Ensured are located.

Fisher closed the door and heavily sedated ▮▮▮ with an unknown substance. ▮▮▮ and ▮▮▮ stated that ▮▮▮ "technically" worked for Dr. Fisher from May or June 2008 to October 2009, approximately one month before her death.

▮▮▮ and ▮▮▮ further stated that Dr. Fisher currently dates ▮▮▮▮▮▮▮, a chemistry professor at West Virginia State University. Per ▮▮▮ and ▮▮▮, ▮▮▮ started seeing Dr. Fisher as a patient in relative good health, but quickly deteriorated into another "mystery-like illness." ▮▮▮ and ▮▮▮ stated they fear ▮▮▮ will die just like ▮▮▮. ▮▮▮ reported that, on July 23, 2010, she overheard Dr. Fisher open his safe and provide ▮▮▮ with what sounded like pills, telling ▮▮▮ "It's glorified aspirin." Further questioning revealed that Dr. Fisher often refers to controlled substances as "glorified aspirin."

In addition to ▮▮▮ and ▮▮▮, ▮▮▮ and ▮▮▮ identified to your affiant and trooper the following females as patients who dated Dr. Fisher and received controlled substance prescriptions from him:

▮▮▮▮▮▮▮▮▮▮

Moreover, ▮▮▮ and ▮▮▮ described an incident in which Dr. Fisher accepted fentanyl patches from a patient and immediately provided them to a "patient-friend" named ▮▮▮▮▮▮. ▮▮▮ further identified ▮▮▮▮▮ as a former employee who claims to

16

know that Dr. Fisher transported pills back to his residence and stored them in a "silver metal box." ████ stated she has witnessed oxycodone, originally prescribed to ████████, inside Dr. Fisher's office desk.

Prior to closing the interview, ████ and ████ provided your affiant and trooper with information on the following patients:

████████████ - A Kentucky resident who fatally overdosed on methadone. Often received early "refills."

████████ - A patient who non-fatally overdosed on prescriptions by Dr. Fisher. Upon hearing news of the overdose, Dr. Fisher stated, "Don't blame the match for starting the forest fire."

████████ - A regular recipient of Suboxone prescriptions who lives in Mississippi and who has not been seen by Dr. Fisher for two years.[7]

████ and ████ verified with your affiant and trooper that Dr. Fisher maintains both hardcopy medical records and digital medical records, which are scanned into the business' computer system. ████ and ████ recalled an incident in which Dr. Fisher complained about the cost of incinerating hardcopy medical charts,

---

[7] In May 2010, the DEA conducted an in-depth regulatory inspection of Dr. Fisher's authorization to dispense and prescribe narcotic drugs for the purpose of detoxification or maintenance treatment. In the course of this inspection, your affiant confirmed that ████ resides in Mississippi. However, Dr. Fisher informed your affiant that he treated ████ as often as every three months. Dr. Fisher told the DEA inspectors that he prescribed suboxone, a narcotic drug which can be used for drug treatment, or for pain treatment only. When asked to voluntarily surrender his special DEA authority to prescribe narcotics for drug treatment, Dr. Fisher declined, stating that it might me good to have such authority if needed, or words to that effect.

saying it is more cost effective for him to burn the files at his residential property.

At the close of the interview, ███ provided a compact disc to your affiant and trooper, saying it contains photographs of blank, pre-signed prescriptions and other items in Dr. Fisher's office. A review of files on the compact disc showed several photographs depicting two pads of blank prescriptions with Dr. Fisher's alleged signature. Also depicted in these photographs is a newspaper dated August 6, 2010. Moreover, the compact disc contains photographs of a prescription vial labeled with the following information:

Date Filled: 7/7/10
Patient: ███
Drug: Oxycodone 15 mg 45 tablets
Prescriber: Philip Fisher, DO

The photographs also showed 21 tablets lying next to the prescription vial.

After this interview, your affiant contacted ███ by way of telephone and confirmed with ███ that, to the best of her knowledge, ███ currently resides with Dr. Fisher, even though ███ owns a residence in St. Albans, WV.[8] ███ stated Dr. Fisher also is dating ███.[9] When asked, ███ informed your

8 An online public records database identifies ███ residence, as recently as December 2, 2010, as 1976 Hash Ridge Road, Barboursville, WV 25504.
9 A review of controlled substance profiles reveals that "███" has been a regular recipient of oxycodone, hydrocodone, and alprazolam prescriptions from Dr. Fisher. A review of pharmacy records on December 2, 2010 indicates that ███ last filled a prescription for alprazolam, a Schedule III controlled substance, under Dr. Fisher's name on November 26, 2010.

affiant that Dr. Fisher permanently maintains patient medical records in either hardcopy or digital format.

**DEA RECORDS CHECK**

In the course of this investigation, your affiant accessed a database maintained by the DEA, which identified Dr. Fisher as purchasing the following controlled substances in 2008 and 2009:

Suboxone 8 mg 300 tablets

█████████████████████

These controlled substances were shipped to Dr. Fisher's registered location, 3554 US Route 60 E, Barboursville, WV 25504. It should be noted that 21 CFR 1304.21 requires DEA registrants to maintain on a current basis a "complete and accurate record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of by him/her." 21 CFR 1304.22(c) requires dispensing records to list the dates, patient names, and number of units/volume of controlled substances dispensed. It also requires the name or initials of the person dispensing the controlled substance. Pursuant to 1304.04(a), these records are required to be kept for at least two (2) years.

Because the address of 3554 US Route 60 East, Barboursville, West Virginia, 25504 has been used for the locations of both Huntington Spine and Rest Ensured, it is possible the controlled

substances purchased by Dr. Fisher and/or records regarding the same, could be located at either premises.

A check of the same database indicates no controlled substances were purchased by Dr. Stultz.  However, Dr. Stultz may have purchased certain controlled substances which would not appear in the queried DEA database.

**BOARD OF PHARMACY RECORDS WHICH CORROBORATE STATEMENTS OF INTERVIEWEES:**

Your affiant gathered the following information from reviewing data from Board of Pharmacy Records:

██████████ - received Oxycodone, Hydrocodone, Oxymorphone, Methadone scripts from Dr. Fisher from 11/20/06 to 9/13/10. Filled the Oxycodone 15mg 45 tablets script (depicted in pictures referred to previously in this affidavit) at Cross Lanes Family Pharmacy, Cross Lanes, WV.

████████ - former girlfriend of Dr. Fisher. Received oxycodone, hydrocodone, phentermine, lunesta, alprazolam, amphetamine, dextroamphetamine, and diazepam scripts from Fisher, date range: 7/15/06 to 9/10/10.

██████████ - former girlfriend of Dr. Fisher. Received controlled substance scripts (adderall, roxicodone, oxycontin, duragesic, actiq, diazepam, fentanyl, and fentora) from Fisher from 6/23/03 to 10/12/07.

████████ - former girlfriend. Received diazepam, hydrocodone, alprazolam from Fisher 1/3/06 to 10/21/08.

██████████ - former girlfriend. Received hydrocodone, diazepam, actiq, oxycontin, from Fisher, date range 2/24/04 to 3/6/05.

████████ - Received methadone and clonazepam from

20

Dr. Fisher, date range 10/8/07 to 8/6/10. Morphine sulfate does not appear on the on the profiles, but the picture presented by ████ showed that ████ obtained morphine sulfate at a Stultz Pharmacy.

████████ ████ - Using the last name "████████" she regularly received hydrocodone scripts from Fisher from 7/21/09 to 9/3/10. Also filled zolpidem, morphine sulfate, and fentanyl scripts from Dr. Fisher.

████████ - Received oxycontin, oxycodone, alprazolam, fentanyl, chlordiazepoxide, opana, levorphanol, hydrocodone, and lorazepam scripts from Fisher, date range 1/8/08 to 10/26/10. Also filled under last name "████████" but believed to be the same person because of same DOB and home address.

████████ - There was a "████████████" who received oxycodone, diazepam, morphine, hydrocodone from 2/17/10 to 5/4/10.

████████ - According to WVBOP, filled Fisher scripts from 2/23/06 to 10/19/10.

According to the WVBOP (as of 11/9/10), Fisher scripts have been filled through 10/28/10.


## BOARD OF OSTEOPATHIC MEDICINE RECORDS

In the course of this investigation, the United States Attorney's Office obtained records from the West Virginia Board of Osteopathic Medicine pertaining to complaints and investigations against Dr. Fisher. Your affiant has reviewed these records, and has determined that Dr. Fisher is the subject of several complaints dating back to 2006.

In March 2006, Dr. ████████████, (████), drafted a letter to the West Virginia Board of Osteopathy. In the letter, ████████ accused Dr. Fisher of becoming romantically involved with female

patients who receive narcotic prescriptions from him. ██████████
identified ██████████ as one such patient. Moreover, ██████████
described Dr. Fisher as storing his patients' "left over" schedule
II narcotics to dispense to other patients, and as prescribing
excessive amounts of narcotics without proper documentation and,
at times, without the benefit of objective studies. Amongst other
things, ██████████ letter alleged that Dr. Fisher falsified
documentation, drew "smiley faces" on patients' buttocks, and
utilized industrial, non-medical superglue from a local store to
inject into patients.

In May 2006, an investigator working on the behalf of the West
Virginia Board of Osteopathy conducted a follow-up interview with
██████████, who stated that ██████████ and Dr. Fisher resided
together. In addition to ████, Dr. Fisher dated another female
patient, ██████████, and took ████ to Seattle, Washington on
May 4, 5, and 6, 2006 for an American Osteopathic College of Physical
Medicine Rehabilitation (AOCPMR) Group Conference. Prior to closing
the interview, ██████████ alleged that Dr. Fisher forged medical
records by documenting improvement in patients, despite these same
patients denying such improvement. She also alleged that Dr. Fisher
sometimes issues prescriptions to patients for up to 10 months without
conducting a follow-up medical examination.

Also in May 2006, the same investigator interviewed Dr. ██████
██████████, who provided the investigator a copy of an email.

In the email, Dr. Fisher identifies ████████████ as his date to the "AOCPMR Council." Your affiant notes that, based on a review of controlled substance profiles, ████████████ received hydrocodone prescriptions from Dr. Fisher from January 2006 to October 2008.

In June 2006, the investigator interviewed "Dr. ████████████" who worked with Dr. Fisher from January 2005 to January 2006. Dr. ████████ confirmed that Dr. Fisher and a girlfriend, ████████, lived together while Dr. Fisher prescribed narcotics to her. ████████ informed the investigator that Dr. Fisher generally did not drug test or properly screen patients receiving narcotics, and that it was fairly well known that patients could make subjective complaints and receive schedule II narcotic prescriptions from Dr. Fisher. Per ████████, Dr. Fisher accused ████████ of scaring away patients by doing drug screens. Lastly, ████████ stated that Dr. Fisher treated many friends for "pain" who worked for him (i.e., bulldozer work, handyman work, etc.).

Also in June 2006, the same investigator spoke with ████████ ████████ who advised that he worked with Dr. Fisher approximately 8 – 10 years ago. During this time, Dr. Fisher billed for patients he did not see and over-billed on patients he did see, eventually being forced to resign and not being able to obtain hospital privileges at St. Mary's Hospital.

23

Regarding why the board failed to take disciplinary action, the investigation indicates as follows:

    a. Regarding Dr. Fisher becoming romantically involved with ███████, the board said BOP records indicated that ███ started seeing another doctor at the time she became romantically involved with Dr. Fisher.

    b. "The board has not been able to sufficiently investigate several of the serious allegations regarding the falsification of procedure outcomes, failure to utilize precautionary screening measures…, and using excess steroids to increase billing revenues because the Complainant has not provided sufficient, specific information to enable the investigation to proceed.

    c. "Similarly, the Board is unable to investigate the allegations that Dr. Fisher has saved and redispensed controlled substance medications returned as unused by some of his patients. The Complainant has not provided any information regarding specific patients who may be interviewed or whose medical charts could be reviewed." It stated the board is without authority to conduct search warrants, but if the allegation was true, it would constitute a criminal violation of controlled substance laws.

    d. Regarding the allegations about using superglue and drawing faces on patients buttocks, "the Board has not made a determination as to whether these allegations were true."

Also included in records obtained from the West Virginia Board of Osteopathy is a list of patients who, according to the board's investigation, lethally overdosed from "accidental poisoning" involving substances prescribed to them by Dr. Fisher. This list includes the following individuals:

24



## C. Controlled Substance Violations

This ongoing investigation is a collaborative effort between the DEA and West Virginia State Police. It has included the interviewing and debriefings of witnesses; the examining of prescription profiles; and an analysis of subpoenaed documents and other records. This investigation indicates that Dr. Fisher unlawfully obtains controlled substances from patients and re-distributes them to girlfriends and other friends. It also shows that Dr. Fisher unlawfully utilizes some of these controlled substances for his own personal consumption. Moreover, it reveals that Dr. Fisher conspired to misuse his DEA registration by permitting office staff to utilize his DEA registration number to distribute controlled substances to patients, and it indicates Dr. Fisher as being potentially complicit in the overdose deaths of at least fourteen (14) individuals, including the death of a former girlfriend, ▇▇▇▇▇▇▇▇▇

The term "controlled substance" means a drug or other substance included in Schedules I, II, III, IV and V as contained in 21 U.S.C. § 812 and 21 C.F.R. 1308.11, 12, 13, 14 and 15. As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R. Section 1308.12(c), Fentanyl is a schedule II controlled substance. According to the official website for the National Institute on Drug Abuse, Fentanyl is a powerful synthetic opiate analgesic similar to morphine. It is typically used to treat patients with severe pain, or to manage pain after surgery. Fentanyl can be deadly when abused.

As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R. Section 1308.12(b), Oxycodone is a schedule II controlled substance. According to the 2010 edition of the Physicians Desk Reference (PDR), Oxycodone is indicated for the relief of moderate to moderately severe pain. It warns that Oxycodone is sought by drug abusers and is subject to criminal diversion.

As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R. Section 1308.13 (e), hydrocodone is a schedule III controlled substance. Hydrocodone is marketed under the brand names of Lorcet, Lortab, Vicodin, and Norco, as well as numerous generic combinations. According to the 2010 edition of the PDR, Hydrocodone is indicated for the relief of moderate to moderately severe pain.

As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R. Section 1308.13 (e), buprenorphine is a Schedule III controlled substance. It is marketed under the brand names Subutex and Suboxone, and is specifically approved by the Food and Drug Administration for use in maintenance and detoxification treatment.

As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R., Section 1308.14 (c), Alprazolam is a schedule IV controlled substance of the benzodiazepine class. Alprazolam is marketed under the brand names Xanax and Niravam. According to the official website for the United States Food and Drug Administration (FDA), Alprazolam is indicated for the management of anxiety disorder or short-term relief of anxiety symptoms. It states that psychological dependence is a risk with Alprazolam, especially in patients with a history of alcohol or drug abuse. It advises that addiction-prone individuals should be under close medical supervision when receiving Alprazolam.

Your affiant knows that the above described controlled substances are presently highly subject to abuse and are available in the illicit marketplace, not only in the Southern District of West Virginia, but also throughout the United States.

As used in this affidavit and pursuant to Title 21, C.F.R., Section 1300.01 (35), the term "prescription" is an order for medication dispensed to or for an ultimate user, but does not include

27

an order for medication that is dispensed for immediate administration to the ultimate user. As further used in this affidavit and pursuant to Title 21, C.F.R., Section 1306.04(a), "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is imposed primarily on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." Pursuant to Title 21, C.F.R., Section 1306.04(b), "a prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients."

Based on your affiant's training and experience, your affiant knows that the Controlled Substances Act (CSA) establishes a "closed system" of distribution that regulates the movement of controlled substances from importation or manufacture through their delivery

28

to the ultimate user by way of the dispensing, administering, or prescribing pursuant to a lawful order of a practitioner. Prescriptions issued not in the "usual course of professional treatment" are not "prescriptions" for purposes of the CSA, and individuals issuing and filling such purported prescriptions are subject to the penalties for violating the CSA. Moreover, it is unlawful for a practitioner to dispense controlled substances outside the usual course of professional treatment.

At all relevant times, Dr. Fisher possessed a valid DEA registration in West Virginia and was authorized to prescribe controlled substances. The current location of his DEA registration is 3554/3458 US Route 60 East, Barboursville, WV 25504. A physician who wishes to possess, distribute, dispense, or prescribe controlled substances as part of his or her professional practice must do so pursuant to a DEA registration (21 U.S.C. § 822; 21 C.F.R. 1301.11). A physician violates 21 U.S.C. § 841 (unlawful distribution of controlled substances) when: (a) the physician distributes or dispenses a controlled substance; (b) the physician acts knowingly and intentionally; and (c) the physician's actions are not for a legitimate medical purpose in the usual course of his professional medical practice or are beyond the bounds of medical practice.

Based on the facts established in this affidavit, your affiant has probable cause to believe that in the Southern District of West Virginia Dr. Fisher has committed, and is continuing to commit, the

29

crimes of illegal distribution of controlled substances, and conspiracy to distribute controlled substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Your affiant also has probable cause to believe that Dr. Fisher misused his DEA registration by allowing others to use his DEA registration number to distribute controlled substances, in violation of 21 USC § 843 (a)(2). Moreover, Dr. Fisher's illegal activity may also include obtaining controlled substances by fraud, in violation 21 U.S.C. § 843(a)(3).

In addition, the facts in this affidavit demonstrate an established pattern by Dr. Fisher, which involves Dr. Fisher removing controlled substances, and other medications, from his medical practice (Huntington Spine) and either distributing them to girlfriends and/or others, taking them to his home and/or personally consuming them. Evidence further indicates that Dr. Fisher has performed procedures involving medications on patients at Rest Ensured. Evidence indicates an established pattern of Dr. Fisher "treating" girlfriends who live with him. There is also evidence indicating that patient files may be maintained at Dr. Fisher's residence, perhaps prior to destruction. There is evidence that controlled substances may be at Dr. Fisher's residence which controlled substance's were obtained from patients for illegal distribution to others, and/or for use by Dr. Fisher.

Henceforth, your affiant has probable cause to believe that evidence of the crimes set forth herein will currently be found in the medical offices/business premises of Huntington Spine and Rest Ensured at 3554/3458 US Route 60 East, Barboursville, WV 25504, and in the residence of Dr. Fisher, 1976 Hash Ridge Road, Barboursville, WV 25504.

## D. Knowledge based on Experience and Training

Based upon my experience, training, and background; my participation in illegal drug distribution operations and investigations; and my conversations with other experienced law enforcement agents/officers with whom I have been associated, I know that:

a. large sums of money are obtained through the illegal distribution of prescription drugs, including controlled substances. These sums of money are often subsequently invested and/or concealed in various investments, assets and financial accounts to avoid detection of these proceeds or assets by government agencies. These assets and investments have been traced back to the illicit enterprise through various financial books, ledgers, tax returns, records, notes, receipts, bank statements and other financial documents found and seized from business establishments and residences of the individuals engaged in the illegal distribution of prescription drugs, including controlled substances, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

b. persons involved in the illegal distribution of prescription drugs, including controlled substances, often conceal in their residences and businesses, and often in safes, large amounts of currency, financial instruments, precious metal, jewelry, and other items of value and/or proceeds of illegal sales of controlled substances and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from persons involved in illegal drug distribution.

31

c.  persons involved in the illegal distribution of prescription drugs, including controlled substances, amass proceeds from the sale of drugs and often attempt to legitimize these profits, or otherwise conceal them from discovery by law enforcement officers.  To accomplish these goals, individuals engaged in illegal distribution activities often use the services of banks and financial institutions, including but not limited to, bank accounts and their attendant check writing privileges and the purchase of securities, cashier's checks, money drafts, and letters of credit.  These individuals often purchase real estate or deposit illegal proceeds in bank accounts in another individual's or entity's name, and use shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds.  Records and documents related to these transactions are often maintained where these individuals have easy and ready access to them, including in their residences and businesses, which are  often kept as computer data files in computers or data in cell phones and personal digital assistants.

d. persons involved in the illegal distribution of prescription drugs, including controlled substances, commonly maintain in their residences and businesses notes, phone numbers, memorandums, books, papers, patient files and business documents relating to the illegal prescription drug activity and/or associates involved in the illegal activity, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

e.  persons involved in the illegal distribution of prescription drugs; including controlled substances, take or cause to be taken photographs of themselves, their associates, their property and their product.  These individuals often maintain these photographs in their residences and businesses, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

f.  unexplained wealth is probative of crimes motivated by greed, including the illegal distribution of prescription drugs, including controlled substances.  Persons involved in illegal drug distribution usually maintain documents related to wealth in their residences and businesses, which are and often kept as computer data files in computers or data in cell phones and personal digital assistants.

## E. Computer Data

From my experience and training, I know that individuals engaged in crimes such as these often maintain records pertaining to their crimes as well as instrumentalities and fruits of their crimes at their businesses and residences. Often this information is stored on computer systems as well as "hard" physical copies. I know from my training and experience that cellular telephones, computer hardware, software, PDS's, documentation, passwords and data security devices may be important to a criminal investigation in two distinct respects:

A.   The objects themselves may be instrumentalities, fruits or evidence of crime; and/or

B.   The objects themselves may have been used to collect and store information about crimes (in the form of electronic data).

Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary

technical manuals and specialized equipment necessary to conduct a thorough search.   In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted or password-protected data.   Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. Typically, the volume of data stored on many computer systems and storage devices will be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.   A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.   A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.   Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers.   Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.   For example, files with the extension ".jpg" often are image files. However, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.   Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard", is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography".   For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.   Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

34

Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords and data security devices which are (1) instrumentalities, fruits of evidence of crime, or (2) storage devices for information about crime.  I also know from my training and experience as an agent that computer storage devices can store the equivalent of thousands of pages of information.  When the user wants to conceal criminal evidence, he/she will often store it in random order with deceptive file names.  This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take weeks or months, depending on the volume of the data stored, and it would be impractical to attempt this kind of data search on site.

Furthermore, I know from my training and experience that searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The wide variety of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Consequently, it is difficult to know before a search which expert should analyze the system and its data.

In light of this information and these concerns, your affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to make mirror

images and/or copies of the computer hard drives and to conduct an off-site search of the hardware for the evidence described.

Your affiant specifically requests authority to seize computer hardware and associated peripherals for no longer than 60 days. Your affiant understands that it is his responsibility to return any seized computer hardware and associated peripherals to their owner within 60 days of the seizure.

## F. Protection the ongoing practice of Dr. Stultz

To date, investigation in this case does <u>not</u> implicate Dr. Stultz in criminal activity. Your affiant understands that Dr. Stultz is a duly licensed psychiatrist who works at Rest Ensured on Wednesdays. A search of the West Virginia Board of Pharmacy database on December 3, 2010, indicates that Dr. Stultz prescribes various types of medications including Ritalin and Adderall (which are commonly used for treatment of Attention Deficit/Hyperactivity Disorder (ADHD) in children and others). It is not clear whether Dr. Stultz practices at locations other than Rest Ensured. However, in June 2010, she changed the location of her DEA registration to "Rest Ensured Sleep Technologies."

Your affiant made a telephone call to Rest Ensured on December 3, 2010, asking for an appointment for a sleep related problem with Dr. Stultz and was told that she works only on Wednesdays. Further, your affiant was told that Dr. Fisher was booked through the holidays.

In order to protect the ongoing practice of Dr. Stultz, your affiant would, upon execution of the Rest Ensured warrant, verify

that agents left a copy of a inventory at the scene, to include a specific list of patient files seized. After the search, your affiant would also to seek to personally advise Dr. Stultz of the search and notify her how to contact him if seized records or documents are needed forthwith for ongoing care of her patients. Also, your affiant, and/or other agents would seek to mirror image any computer on the scene. If that is successful, any computerized information would still be accessible to Rest Ensured and Dr. Stultz. If, for some reason, the mirror imaging is not successful at Rest Ensured, the United States would seek further authorization from the Court to seize the actual computers.

To the extent Dr. Stultz requested copies of seized patient files or other documents, necessary to maintain her ongoing practice as to specific patients, the United States would expedite the copying of such records and would return them to Dr. Stultz as expeditiously as possible. The affiant anticipates that patient files seized from Rest Ensured will be maintained as evidence at the Charleston Resident Office of the DEA.

With regard to controlled substances located at Rest Ensured, your affiant hereby seeks authority to seize only controlled substances which are prescribed to individuals who are not present, and/or inventories of controlled substances for which there is no documentation to establish that they belong to Dr. Stultz.

## G. Conclusion

Based on the aforementioned, I have probable cause to believe that within Huntington Spine and Rest Ensured, located at 3554/3458 US Route 60 East, Barboursville, WV 25504, and at the Residence of Dr. Fisher at 1976 Hash Ridge Road will be the items described in the "Items to be Seized," Attachment B hereto, all of which constitute fruits or evidence of violations of 21 U.S.C. §§ 841(a)(1), 846, 843(a)(2), 843(a)(3).

The above information is true and correct to the best of my knowledge, information and belief.

Further your affiant sayeth naught.

_____
Mark A. Armstrong II
Diversion Investigator
Drug Enforcement Administration

Sworn to before me, and subscribed in my presence, this 6th day of December, 2010.

_____
CHERYL A. EIFERT
United States Magistrate Judge

**ATTACHMENT A**
**(Business Premises Located**
**at 3554/3458 US Route 60 East**
**Barboursville, WV 25504)**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

1. **Huntington Spine Rehab and Pain Center** –

   Huntington Spine Rehab and Pain Center is located at 3554 US Route 60 East, Barboursville, WV.  It appears to be a single story building constructed primarily of brick and metal siding.  It bears a sign or signs indicating the name of Huntington Spine Rehab and Pain Center or words to that effect.  It is connected to another building via a cinder-block passage.  It is situated on the left side of the property with a parking lot to the side.

2. **R.E.S.T./Rest Ensured Sleep Technologies** –

   Directly across the parking lot from Huntington Spine Rehab and Pain Center is R.E.S.T./Rest Ensured Sleep Technologies.  It appears to be a single story building constructed primarily of brick and metal siding.  It bears a sign with the name of the R.E.S.T./Rest Ensured, or words to that effect.  The street address for Rest Ensured is either 3554 or 3458 US Route 60 East, Barboursville, West Virginia, 25504.





**ATTACHMENT A**
**(Residence of Dr. Philip F. Fisher (D.O.)**
**Located at 1976 Hash Ridge Road,**
**Barboursville, WV 25504)**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

1976 Hash Ridge Road, Barboursville, WV 25504, pictured below, is a double-wide mobile home located on 29-acres in Cabell County, WV. Upon entering Hash Ridge Road from Main Street in Barboursville, WV, the property's entrance is approximately 1.6 miles on the left-hand side of the road, directly after Hash Road Baptist Church. The property's entrance is a gravel driveway with a sign depicting an airplane and displaying the word, "Welcome." The driveway leads directly to the mobile home, which is the only residential structure on the property. The residential structure itself is located next to a while, metal-sided garage.



# ATTACHMENT B

ITEMS TO BE SEIZED

The government seeks to seize the following items which are believed to be kept and maintained on the premises described in the Search Warrant:

(1)   With regard to the patients identified on the attached "Complete Patient Seizure List":

    (a)   Complete patient files and billing information, including but not limited to, clinical records, progress notes, charts, superbills, fee tickets, encounter forms, routing slips, and similar documents; patient bills, invoices, insurance claims, claim forms, explanations of benefits, copies of checks or electronic transfers of payments, billing and payment records, patient ledgers or account cards; all schedule books, calendars, appointment books, patient sign-in logs or sheets and similar records

    (b)   All correspondence that in any way relates to the patients

    (c)   All laboratory test orders and laboratory test results

    (d)   Any and all agreements with patients

(2)   Any pre-signed or filled out prescriptions

(3)   The computer hardware (and associated peripherals) associated with any and all computers maintained at the search site - for the purpose of making a mirror image

    With regard to Rest Ensured, authority is granted for on-site mirror imaging only, if on-site mirror imaging is not successful, further court authorization must be sought before computer hardware (and associated peripherals) are seized

    In the event that any computer hardware (and/or associated peripherals) are seized, they must be returned to their owner within 60 days of seizure.

(4)   With regard to Dr. Fisher:

    (a)   Personal and business schedules, calendars, travel documents, telephone numbers, telephone messages

    (b)   Any and all biographical, financial, and business documents, to include but not limited to memorandums, letters, correspondences

    (c)   Photographs, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, in particular, photographs of co-conspirators and photographs documenting commission of crimes

(5)   Any and all documents and records, contracts, writings, electronic mailings or other material relating to those listed in the complete patient seizure list attached hereto

(6)   Any and all controlled substances and corresponding package materials or prescription vials

**With regard to Rest Ensured, prescribed controlled substances (e.g. tablets in a prescription vial), in the names of individuals who are not present, may be seized. Stock controlled substances for which there are no records indicating that Dr. Stultz received shipment (per 21 C.F.R. 1304.21/1304.04(a)), may also be seized**

(7)   Records and documents relating to the purchase, dispensation, administration, prescription or distribution of controlled substances required to be maintained pursuant to Title 21, C.F.R., Section 1300 et seq.

(8)   Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to, utility and telephone bills, rental, and/or purchase, and/or lease agreements.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON

IN RE:

HUNTINGTON SPINE REHAB AND PAIN CENTER
LOCATED AT 3554 US ROUTE 60 EAST
BARBOURSVILLE, WV 25504          Magistrate No. 3:10-mj-00045

COMPLETE PATIENT SEIZURE LIST

